# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-KA-00779-SCT

*KENNETH MOODY*


*v.*


*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 04/12/2001 |
| TRIAL JUDGE: | HON. RICHARD W. McKENZIE |
| COURT FROM WHICH APPEALED: | PERRY COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM B. KIRKSEY |
| | JOHN MICHAEL HORAN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEAN SMITH VAUGHAN |
| DISTRICT ATTORNEY: | E. LINDSAY CARTER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/13/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE PITTMAN, C.J., WALLER AND CARLSON, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.	This is Kenneth Moody's second time before us. Moody was indicted in 1995 by the Perry County Grand Jury on two counts of capital murder and one count of simple murder in cause number 4369 on the docket of the Circuit Court of Perry County, Mississippi. On June 22, 1995, Moody executed a written "Memorandum of Understanding," which provided, inter alia, that Moody would plead guilty to the murder charges and would cooperate fully by making complete disclosures to the State regarding his knowledge of the

charged offenses, his participation, and the participation of his co-defendants. In exchange for his plea, the State agreed not to seek the death penalty; however, this agreement was rejected by the trial court. The trial court certified the matter for interlocutory appeal to this Court, we granted the interlocutory appeal, and then thereafter, we reversed and remanded for further proceedings, finding that the trial court had abused its discretion in refusing to accept Moody's plea agreement. *Moody v. State*, 716 So.2d 592 (Miss. 1998). Because of this holding, the trial court was directed upon remand to enforce the plea agreement, in toto. *Id.* at 595-96.

¶2. Upon remand to carry out this Court's directive to enforce the plea agreement, the trial court set this matter for hearing to accept Moody's guilty pleas and to impose sentences consistent with the plea agreement. However, while awaiting this Court's decision on his vehement protestations via appeal because of the trial judge's refusal to enforce the plea agreement, Moody evidently considered the serious ramifications of enforcement of the previously executed Memorandum of Understanding and decided that it would be imprudent for him to perform the terms of the agreement. Deductive reasoning enables us to come to this conclusion because a careful review of the transcripts of the various pre-trial hearings in this case before us today reveals that both the State and defense counsel stated into the record that upon this Court's remand, Moody failed to fulfill the terms of the Memorandum of Understanding in that he refused to offer his pleas of guilty as required, in cause number 4369. In other words, although Moody was the one who initially complained because the trial judge would not accept his guilty pleas and impose two consecutive life sentences in

2

order for him to avoid the possibility of a jury's imposition of the death penalty, in the end, it was Moody who reneged on the agreement and refused to be bound by its terms. Not surprisingly, based on Moody's failure to fulfill the terms of the plea agreement, the State filed a motion to revoke the Memorandum of Understanding; and, by order dated September 22, 1998, and entered in cause number 4369, the trial judge declared the Memorandum of Understanding to be null and void.[1]

¶3.     While the record does not reveal whether cause number 4369 was dismissed, nolle prossed (order of nolle prosequi), or remanded, we do know that the record reveals that in cause number 4856 (the case sub judice), the Perry County Grand Jury returned a two-count capital murder indictment against Moody on December 21, 2000.  Count One charged Moody with the murder of Robbie Bond while engaging in the commission of sexual battery upon her, and Count Two charged Moody with the murder of William Hatcher while engaged in the commission of sexual battery upon Robbie Bond.  *See* Miss. Code Ann. §§ 97-3-19(2)(e) & 97-3-95(1)(a).   After a change of venue, a trial was held in the Second Judicial District of Harrison County from March 27, 2001, through April 7, 2001, Honorable Richard W. McKenzie presiding.[2]   The jury returned verdicts of guilty on both counts of capital murder, but was unable to unanimously agree on punishment. Therefore, as mandated

---

[1]Of course, this action by the trial court was taken subsequent to our June 11, 1998, decision on Moody's appeal concerning the enforcement of the Memorandum of Understanding.

[2]Harrison County is one of ten Mississippi counties which has two judicial districts.  On March 5, 2001, Moody, through counsel, made an ore tenus motion, unopposed by the State, to have the special venire drawn from both the First and Second Judicial Districts of Harrison County. Judge McKenzie subsequently entered an order granting this motion. *See* Miss. Code Ann. § 13-5-21.

by the applicable statutes, Judge McKenzie sentenced Moody to terms of life imprisonment without parole eligibility. *See* Miss. Code Ann. §§ 99-19-101(3) & 47-7-3(f). Additionally, Judge McKenzie, in the exercise of discretion, ordered that these two life sentences were to run consecutively, as opposed to concurrently. *See* Miss. Code Ann. § 99-7-2(5).

¶4. Moody filed a motion for judgment notwithstanding the verdict (JNOV), or in the alternative, a new trial and the trial judge denied the motion. It is from the denial of this motion that Moody appeals, seeking reversal of his convictions and sentences and a remand of his case for a new trial. Finding no reversible error, we affirm.

## FACTS

¶5. On May 15, 1995,[3] Dana Moore, Peyton McKay, and Joey Byrd, co-workers and friends of Robbie Bond and William Hatcher, became concerned about Hatcher's whereabouts because he had not shown up for work that day.[4] They found this unusual because Hatcher never missed work. When Dana Moore's shift ended, she began looking for both Bond and Hatcher at their respective homes, but could not locate them. The night before, Bond and Hatcher asked Dana to accompany them to the Mahned Bridge in Perry County, though Dana did not join them. Moore, McKay, and Byrd finally drove out to the Mahned Bridge to look for Bond and Hatcher.

---

[3]Moore originally testified the date they became concerned was May 14, which was later corrected in the record as May 15.

[4]Bond and Hatcher worked with Moore, McKay, and Byrd at McAlister's Deli in Hattiesburg. Bond was not scheduled to work that day.

4

¶6.     They arrived in the middle of a sunny afternoon. The first thing they spotted was Hatcher's truck. Upon approaching the truck, Moore found Bond's key chain and necklace. After these discoveries, the three left the bridge, and Moore returned to tell her boss, John Grafton, and Hatcher's brother, Eric. Moore, Grafton, and Eric immediately returned to Mahned Bridge. While on the bridge the second time, Moore testified that Moody drove across the bridge in a white truck.[5] A short time later, the three went to a nearby house where a female occupant called the police.

¶7.     Perry County Sheriff Carlos Herring arrived on the scene within 20 minutes. Other investigators from the Mississippi Highway Patrol (MHP) were called in later. Don Sumrall, then-lieutenant with the MHP Criminal Investigation Bureau (CIB), testified he found a knife blade and knife handle with the blade missing on the bridge. Sumrall collected the knife blade and handle, believing them to be blood stained. He also collected hairs and a leaf he believed to be blood stained. He also took a photograph of a bloody footprint and blood stains on the board road of the bridge. Lt. Sumrall sent the evidence he had collected to the Mississippi Crime Laboratory. Chief Deputy Jimmy Smith of the Perry County Sheriff's Department testified that Kenneth Moody was picked up for questioning on May 18, 1995. Smith testified Moody was not under the influence of alcohol or drugs and was read his *Miranda* rights before giving a statement.

---

[5]She did not recognize him at the time, but realized who he was four days later.

¶8.    MHP criminal investigator Sammy Pickens testified that he obtained a search warrant for Kenneth Moody's residence and property. After the discovery of the bodies of Bond and Hatcher on Moody's property on the evening of May 18, 1995, Moody was formally placed under arrest. After his arrest, Moody signed a waiver of his *Miranda* rights. After being advised of his *Miranda* rights, Moody waived those rights and confessed to the murders of both Bond and Hatcher, A partial transcript of Moody's confession was admitted at trial.[6]

¶9.    Deborah Haller, a forensic scientist with the Mississippi Crime Lab, was requested by local law enforcement officials to come to the Moody property to examine a blue pick-up truck and to excavate the gravesite of Bond and Hatcher. At approximately 11 p.m., May 18, 1995, Haller and other personnel removed the body of an unclothed female, hands bound by jumper cables, from a grave on Moody's property. The body of a clothed male was found underneath the body of the female. Vaginal swab testing of the female identified the presence of seminal fluid. The swabs were sent to Reliagene, a DNA Testing lab in New Orleans.

¶10.    Forensic scientist Joe E. Andrews of the Mississippi Crime Lab identified hairs from the truck as exhibiting the same microscopic characteristics as the known hairs of Bond.

---

[6]David Moody, a/k/a William David Moody, Kenneth Moody's 14-year old cousin, was also indicted for his involvement in these crimes. After a change of venue, David was tried in the Circuit Court of Oktibbeha County and found guilty of capital murder and accessory after the fact to capital murder, receiving two consecutive life sentences. His convictions and sentences were affirmed by the Court of Appeals on September 10, 2002. *Moody v. State*, 2002 WL 31013708 (Miss. Ct. App. 2002). David filed a petition for writ of certiorari which was denied by this Court on February 13, 2003. Additional facts concerning these murders are found in the Court of Appeals' decision on David's case.

¶11. Dr. Steven Hayne, a forensic pathologist with Renal Laboratories, conducted autopsies on the bodies of Bond and Hatcher and found the bodies to be in states of decomposition from burial. Dr. Hayne determined that Hatcher had single stab wounds to the head and neck below the right ear. He had a slash wound under his chin and also injuries to the soft tissue of the scalp on the right side of the head. There was blunt force trauma to the right side of Hatcher's head. There was also a single stab wound on the back of the right hand and two stab wounds to his back. A large fracture was found at the base of the skull. Dr. Hayne determined that Bond was also the victim of blunt force trauma to the face and suffered skull fracturing. Bond also had defensive posturing injuries to the forearms and back of her hands. She was missing her right thumb. Dr. Hayne found no vaginal trauma, but testified such trauma would not always be present in cases of sexual assault. Dr. Hayne also found bruises on Bond's thighs and bruising in Bond's larynx, which resulted from something being forced approximately two and a half inches into her larynx.

## DISCUSSION

**I.   WHETHER THE TRIAL JUDGE CORRECTLY INFORMED THE JURY THAT THE DEFENDANT WAS PRESUMED INNOCENT UNTIL PROVEN OTHERWISE BY THE STATE.**

¶12.   During the fourth day of jury voir dire, the trial judge, according to Moody,

incorrectly equated presumption of innocence with the directed verdict standard.   The trial

judge stated:

> Okay.  Thank you.  In order to accomplish our task, we must
> first select a jury of 12 people from among you.  Once those 12
> are selected, they will be sequestered or kept apart day and night
> for the remainder of the trial.  We shall also select an
> appropriate number of alternates.
>
> During the first stage of the trial, it will be the responsibility of
> the jury to determine whether the defendant Kenneth Moody is
> guilty or not guilty of capital murder.  In order for the jury to be
> able to make this decision, the jury will first be presented
> evidence by the state or the prosecution.  This evidence will be
> that which the state has determined shows that Kenneth Moody
> is guilty of the crime as charged.  However, the burden of proof
> is on the State of Mississippi  to prove the defendant is guilty of
> the crime charged beyond a reasonable doubt.
>
> After the state has concluded its presentation of evidence, the
> defendant Kenneth Moody may present evidence in his on (sic)
> behalf; however he is not required to do so.  The defendant is
> not required to testify himself nor is he required to call any
> witnesses whatsoever.  The defendant Kenneth Moody has no
> burden to prove his innocence of this crime or to prove anything
> at all.  The reason for this is that under our system of laws the
> defendant is presumed innocent of the crime charged and has no
> duty to prove his innocence.
>
> In this same vein, I will tell you that the defendant is not
> required to testify in his own behalf.  The jury cannot consider
> the fact that the defendant does not testify as evidence of guilt.
> This is a constitutional right and cannot be questioned by a jury.
>
> Now, let me pause here parenthetically and go in depth with you
> a little bit more about the presumption of innocence.  Do all of
> you understand, as he sits there now, this defendant is presumed
> to be innocent?  (Jurors nod affirmatively)

Okay. ***That presumption of innocence attends him and follows him throughout the course of the trial unless and until it is overcome by the State of Mississippi. Now, if it is not, you will not have to worry about it because the Court will rule on that.*** But even though there is the presumption of innocence, if at any point during the course of the trial the states (sic) overcomes that presumption of innocence, then from that point on that presumption of innocence no longer attends the defendant.

(Emphasis added).

¶13. The State argues that no contemporaneous objection was made at the time of the trial judge's giving the instruction and that Moody did not object until after the remaining members of the jury panel had been excused, which therefore did not give the trial judge a timely opportunity to correct the mistake. When he finally did object, Moody argued:

> MR. HORAN: Your Honor, Kenneth Moody comes before the Court and moves for a mistrial on the following grounds as well: During the Court's presentation, discussion and preamble to the jury in stating – and maybe I misheard the Court, but out of abundance of caution, I will basically paraphrase. I believe the Court stated that the presumption of innocence rides (sic) with the defendant throughout the proceedings and that it can only be overcome by proof from the state, and that if the state does not overcome that presumption, they won't have to worry about it, that the Court would take care of it. In our opinion, that is a misstatement of the law to some extent.
>
> THE COURT: In what regard?
>
> MR. HORAN: If the court gives the case to the jury, i.e., does not direct a verdict at the end of the state's case.
>
> THE COURT: That is exactly what I was talking about.
>
> MR. HORAN: Yes, sir.
>
> THE COURT: If they don't meet it, I direct a verdict.

9

MR. HORAN: Yes. But the presumption of innocence still rides (sic) with him.

THE COURT: It's a moot matter at that point because it's been a directed verdict and he's not before the–the jury has no determination to make.

MR. HORAN: The point is, if the converse is not true, that if the case goes to the jury or, i.e., gets past a directed verdict, that that appears to say that presumption has been made; and, therefore, the defendant must put on some proof to overcome it.

THE COURT: That is not what it says at all. I'll note your motion and overrule the same.

¶14. In capital cases, the procedural bar may be relaxed because of the nature of the right asserted. *See West v. State,* 485 So.2d 681, 687-88 (Miss. 1985). Also, this Court has relaxed its procedural bar to consider serious cumulative errors. *See Williams v. State,* 445 So.2d 798 (Miss. 1984). Even in capital cases, a procedural bar is applied on a case-by-case basis, based on a number of factors. *Pinkney v. State*, 538 So.2d 329, 338 (Miss. 1988).

¶15. In *Hull v. State*, 687 So.2d 708, 719-720 (Miss. 1996), this Court refused to review a judge's comments to the jury during voir dire which drew no objection until counsel had gone to the trial judge's chambers and were outside the presence of the jury. We held in *King v. State*, 615 So.2d 1202, 1205 (Miss. 1993), that it was "elementary that, for preservation of error for review, there must be contemporaneous objections." (citing *Smith v. State*, 530 So.2d 155, 161-62 (Miss. 1988)).

¶16. This Court has decided many cases addressing a failure to give a contemporaneous objection constituting a waiver of that issue on appeal. In *Doss v. State*, 709 So.2d 369 (Miss. 1996), we held that a lack of contemporaneous objection to striking prospective jurors for cause was a procedural bar as to that issue on appeal. In *Irving v. State*, 498 So.2d 305 (Miss. 1986), we held that a death penalty defendant's failure to make a contemporaneous objection to the racial composition of his jury waived the issue of alleged improper use of peremptory challenges to remove black jurors. In *Ballenger v. State*, 667 So.2d 1242 (Miss. 1995), we held that the failure of the defendant to make a contemporaneous objection to the moving of a venireman to the end of the list of potential jurors as violative of her due process rights left the claim unpreserved on appeal.

¶17. A recent case involving the presumption of innocence is *Simmons v. State*, 805 So.2d 452 (Miss. 2001). We found no error where the trial judge sustained the State's objection to the defense calling the defendant an "innocent" man, instead of saying he was "presumed" innocent.

¶18. The record in this case reveals that the objection was not contemporaneous with the trial judge's alleged prejudicial voir dire to the prospective jurors. Additionally, after these objectionable comments were made by the trial judge, he continued the court's voir dire and informed the prospective jurors that after all the evidence was presented, he would give detailed instructions of law to the jury to guide them in making a decision as to "guilt or innocence." The trial judge also informed the jury panel that after the instructions had been read to the jury, the trial jurors would hear closing arguments from the attorneys and then the

11

jury would retire to determine whether Moody was "guilty or not guilty" as to each of the two counts of capital murder. Then the trial judge moved into another major area of examination of the prospective jurors regarding the penalty phase of the trial, inquiring into their feelings about the death penalty, and several jurors were individually questioned by the judge on this issue. The trial court in due course declared a noon recess, and upon return from the noon recess, but outside the presence of the jury panel, the trial judge for the first time heard defense counsel's objection to his supposed prejudicial comments to the jury panel during the court's voir dire that morning. This was certainly not a contemporaneous objection. Additionally, there is no error as to this issue. The trial judge even admitted that if Moody's interpretation of his comments to the jury is the correct interpretation, then "I have been in error for 25 years." While there was one comment by the judge that he would take the case from the jury if the State did not present sufficient evidence to overcome the defendant's presumption of innocence (thereby perhaps inferring that if the jury got the case for deliberation, the State, in the judge's opinion, had overcome the presumption of innocence), when one reads the entire transcript of the court's voir dire on the presumption of innocence, the burden placed on the State, which is never removed, and the jury's responsibilities once it gets the case for deliberation and decision, there is no doubt that the trial court properly informed the jury on these points. Moody was represented by very capable defense attorneys with years of experience in criminal defense, one of whom also had years of experience as an assistant district attorney. This Court has no doubt but that if either of these very capable attorneys believed that Judge McKenzie had committed such an

12

egregious error at the time he made these objectionable comments to the jury, one of them would have hit the floor with a vigorous objection. Further, Jury Instructions C-3 and C-4 were given, without objection, by the trial judge. These instructions fully set out the presumption of innocence and the burden of proof, and provide correct statements of law and cure any possible error. Both sides concede that "It is presumed that the jury follows the judge's instructions." *Davis v. State*, 660 So.2d 1228, 1253 (Miss. 1995); *Walker v. State*, 671 So.2d 581, 618 (Miss. 1995).

¶19. Finally, on this issue, we must also remember that these objectionable comments were made during the fourth day of voir dire on March 29, 2001. We can be certain that when these jurors retired to deliberate on April 12, 2001, some fifteen (15) days and 1,780 pages of trial transcript later, after being fully questioned on voir dire, after hearing all the evidence, and after receiving the jury instructions and hearing closing arguments of counsel, their verdicts were not in any way affected by this one comment made by the trial judge during voir dire.

¶20. This assignment of error is without merit.

## II. WHETHER THE JURY WAS TAINTED BY PRETRIAL PUBLICITY.

¶21. Moody contends that the trial judge erred by failing to admonish the jury venire not to talk about the case or watch television reports regarding it. At the end of the first day of jury voir dire on March 26, 2001, the trial judge admittedly forgot to admonish the jury venire not to watch television or read newspaper accounts of the trial during the overnight

13

recess. The next day, after several preliminary matters had been discussed with the judge and attorneys, and after a group of jurors were excused by the trial court by agreement of counsel, Moody, through counsel, then moved to strike the entire jury venire, which was not sequestered, on the basis that on the previous evening there had been extensive media television coverage of the case on at least one, and possibly two, Gulf Coast television stations.[7] Once this matter was brought to Judge McKenzie's attention, he conducted specific voir dire to determine what jurors had been exposed to media coverage. In so doing, Judge McKenzie, out of an abundance of caution, divided the venire persons into two groups – those who had gained knowledge of the case by discussion or through the media, and those who had heard nothing about the case. After extensive voir dire over the course of seven (7) days, and the dismissal of numerous prospective jurors who had outside knowledge of the case, the trial jury which was eventually seated consisted of only two jurors who had any knowledge of the case, and both of those jurors, in response to questioning, had assured the trial court that they could render fair and impartial verdicts based solely on the evidence and the law. Once the trial jury was seated and before the actual trial began, Judge McKenzie instructed the jurors in detail as to their conduct, including the fact that while sequestered

---

[7]The Mississippi Uniform Circuit and County Court Rules (URCCC) govern the conduct of trials in our circuit and county courts. URCCC 10.02 mandates jury sequestration only where the State seeks to impose the death penalty; otherwise, jury sequestration in criminal cases is vested in the sound discretion of the trial judge. Certainly here, since the State was seeking the death penalty against Moody, the trial judge was required to, and did in fact, sequester the trial jury. However, sequestration of the entire jury venire is neither practical nor required by the rule.

14

at a motel, they would have television access, but that the news channels had been "taken off" the televison sets in the rooms.

¶22.    We have held that "judicial determination of whether a juror is fair and impartial will not be set aside unless such determination is clearly wrong." *Smith v. State*, 802 So.2d 82, 86 (Miss. 2001).

¶23.    Moody complains of a tainted jury pool and argues that the entire panel should have been stricken after the trial judge's failure to admonish the jury pool on the first day.[8] Even after the judge divided those who had heard about the case in the media from those who had not, Moody was still not satisfied.  The trial jury, consisting of twelve regular members and two alternates, was empaneled after extensive voir dire and the subsequent sequestration and individual questioning of media-exposed and non-media exposed jurors.  Of the actual jurors chosen, Moody argued that Johnny Jefferson and Shellie O'Keefe had outside knowledge of the facts of the case.[9]

¶24.    The individual voir dire of Johnny Jefferson revealed absolutely nothing prejudicial. He basically testified that he recognized one of Moody's attorneys, William Kirksey, on a

---

[8]In fact, during the course of the extensive voir dire, and after the jury venire's exposure to media coverage, Moody, through counsel, made no less than three (3) motions to quash the jury panel due to the media exposure.

[9]Moody complained of a number of venire members having outside knowledge, all of whom were stricken, except for O'Keefe and Jefferson.  Because the peremptory challenge issue is discussed in the following issue, we discuss only Jefferson and O'Keefe, who were selected to serve on the jury.

television report. He testified to no specific facts about the case and testified he could be fair and impartial.

¶25. Juror Shellie O'Keefe revealed in her individual voir dire that she had heard about the case:

> A: I heard that there had been two murders, and that two gentlemen were involved – something about being cousins. I don't know if the two people that were killed were cousins or the two people that killed the other two people were cousins; that there was a woman involved, that she was raped – something about with a pipe down her throat or something, that's all I heard.

¶26. O'Keefe testified that no names were mentioned in the news accounts, and she stated during cross-examination that she harbored no ill-will toward Moody, nor had she formed an opinion of any type.

¶27. In *Porter v. State*, 616 So.2d 899, 906 (Miss. 1993), we held, "[t]hese promises of the venire members must be given considerable deference." (citing *Scott v. Ball*, 595 So.2d 848, 850 (Miss. 1992)). In *Porter*, we upheld the trial court's refusal to strike twenty venire members for cause simply because they had been shocked, upset, or bothered by hearing about the case. They testified to the trial court that they had not been prejudiced by hearing about the case and could decide the case on the evidence and the law.

¶28. Both the State and Moody cite *Earley v. State*, 595 So.2d 430, 431 (Miss. 1992) as precedent explaining what to do if a juror reads a newspaper article about a pending case. In *Earley,* the trial judge, prior to adjourning for the day, also forgot to admonish the jury

16

about reading anything concerning the case. When court reconvened the next day, the trial judge asked if any of the jurors had read anything about the case. Four jurors had gained information about the case. The judge polled each juror individually and alone and discovered only one to have read anything which could have been perceived as detrimental. That juror was excused. We held that the trial judge did not abuse his discretion by failing to grant a mistrial where jurors had read a newspaper account of the case. Because the trial judge dismissed the offending juror and gave curative instructions, we affirmed Earley's conviction. Moody argues here that there should have been similar action in this case. However, *Earley* and the case sub judice are not factually analogous. In *Earley,* the juror was dismissed for reading a newspaper article after the jury had been seated. The actions which Moody argue constitute error in the case sub judice happened during voir dire. Moreover, the juror in *Earley*, after the trial began, had read information in the newspaper about potentially prejudicial comments made outside the presence of the jury.

¶29. In the case before us today, O'Keefe had heard extraneous facts about the case before she had actually been selected for the jury. She testified she never knew the names involved and had not formed an opinion about the case at all. The offending juror in *Earley* read an article in the newspaper about the specific case and about specific portions of the case which obviously a reporter had heard, but the jury had not. *Id.* at 432.

¶30. The State correctly cites *Mu'Min v. Virginia*, 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed. 2d 493 (1991), for the proposition that the purpose of voir dire is to enable the court

to select an impartial jury and to assist counsel in its use of peremptory challenges. *Mu'Min* held that the question is not whether members of the jury pool had heard of a particular case through the media, but whether the potential juror "had such fixed opinions that they could not judge impartially the guilt of the defendant." *Mu'Min*, 500 U.S. at 430; 111 S.Ct. at 1908. The *Mu'Min* Court explicitly stated that jurors need not be completely ignorant of the facts and issues involved. *Id*.

¶31.  Interestingly, the United States Supreme Court rejected Mu'Min's contention that because eight of the twelve jurors finally seated in his case had read or heard something about his case, his due process rights had been violated. In the case sub judice, only two of the trial jury members had heard anything about the case and Moody did not demonstrate that he was "seriously or irreparably" damaged by the vague details the two jury members had heard. According, this issue is without merit.

### III. WHETHER THE DEFENDANT WAS PREJUDICED BY THE TRIAL JUDGE'S DENIAL OF ADDITIONAL PEREMPTORY CHALLENGES.

¶32.  Moody argues that he was prejudiced by having to use all of his peremptory challenges to strike jurors with knowledge of the case. The State argues that loss of a peremptory challenge does not constitute violation of a right to an impartial jury and that simply using peremptory challenges does not mean his constitutional rights have been violated. Additionally, the parties in their briefs concede, and the record reveals, that they were each graciously afforded "an additional [peremptory] challenge" by the trial judge. In

18

fact the record reveals that during jury selection, Judge McKenzie stated "I'll even add one challenge per side...I'm going to give you 19 strikes." Also, the trial judge, in accordance with the applicable rule, granted two additional challenges to each side for use during selection of the two alternate jurors. This is interesting because since this was a death penalty case, and since the trial judge had determined that two alternate jurors would be seated, each side pursuant to uniform rule, would have only been entitled to 14 peremptory challenges – 12 in selecting the regular trial jury members and 2 in selecting the alternate jurors. *See* URCCC 10.01 concerning the selection of the regular trial jury members in death/life cases, and URCCC 10.01(a) concerning the selection of alternate jurors in death penalty cases. ("In death penalty cases the peremptory challenges shall equal the number of alternate jurors the court has ordered to be selected."). From the record in this case and the applicable law, Moody (and the State) received from the trial judge much more than that to which they were entitled – 21 peremptory challenges each instead of 14 each. In picking the 12-member trial jury, the State used 18 of its available 19 peremptory challenges and Moody used all 19 of his available peremptory challenges. In selecting the two alternate jurors, both the State and Moody each used one of their two peremptory challenges.

¶33. Again, *Mu'Min* is instructive: "*Voir dire* examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." *Mu'Min*, 500 U.S. at 430; 111 S.Ct. at 1908. *Mu'Min* also held, as we stated *supra*, a juror is not required to be completely ignorant of facts and issues.

19

¶34. This Court addressed this issue in *Mettetal v. State*, 615 So.2d 600, 603 (Miss. 1993):

> The loss of a peremptory challenge, however, does not constitute a violation of the constitutional right to an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean that the defendant was denied his constitutional rights. *Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80, 90 (1988).

> > This Court has explained that a prerequisite to presentation of a claim of a denial of constitutional rights due to denial of a challenge for cause is a showing that the defendant had exhausted all of his peremptory challenges and that the incompetent juror was forced by the trial court's erroneous ruling to sit on the jury. *Chisolm v. State,* 529 So.2d 635, 639 (Miss. 1988).

615 So.2d at 603, also citing *Mettetal v. State*, 602 So.2d 864, 869 (Miss. 1992).[10]

¶35. Keeping in mind the reasoning *Mu'Min* and *Mettetal*, Moody's arguments become less persuasive. Through voir dire, the trial court's excusing jurors for cause, and the attorneys' use of peremptory challenges, Moody benefitted from a jury which had only two members who had even vaguely heard anything about his case.

¶36. Moody argues that his jury was a "peculiarly constituted" jury panel, like the one we discussed in *Mhoon v. State*, 464 So.2d 77 (Miss. 1985). We opined that *Mhoon* was a "statistical aberration" where 12 members of a 39-member jury pool were policemen, or

---

[10]Both *Mettetal* cases involved the same defendant, namely, Jerry Wayne Mettetal, but different murder victims. The 1992 decision of this Court involved Mettetal's killing of Joe Cosby, a Panola County Deputy Sheriff, and this Court's 1993 decision involved Mettetal's killing of his grandmother, Georgia Mae Edwards.

related by blood or marriage to a current or former police officer. In *Mhoon*, the defendant had exercised all of his peremptory challenges and was still left with a jury foreman who was a uniformed police officer. Clearly, Moody's jury did not suffer from such a "statistical aberration."

¶37. Moody argues that the State "takes refuge behind the juror's oath to be fair and impartial, and his promise to give no weight to matters heard outside the courtroom." He cites *Porter v. State*, 616 So.2d 899, 906 (Miss. 1993): "These promises [to decide the case on the evidence and the law] of the venire members must be given considerable deference." Moody attempts to argue that this is a dubious state of the law -- that, simply because jurors state that they can follow the law does not necessarily mean they can or will. However, there is nothing in the record to even slightly infer that the jurors failed in their promises to the court and the parties. This issue is without merit.

**IV. WHETHER THE TRIAL JUDGE PROPERLY MAINTAINED THE JURY SELECTION PROCESS AND DETERMINED THE COMPETENCY OF THE JURORS.**

¶38. Moody argues that there was juror misconduct resulting in a tainted jury panel. During individual voir dire of jury members on the issue of media exposure, the record reveals that the trial judge was informed by the bailiff that certain excused jurors, after participating in individual voir dire, were returning to the gathering of prospective jurors and informing them as to "what to say to get off the jury." Judge McKenzie had already initiated a plan of having excused jurors leave by a separate exit so as to avoid "commingling" with

21

the remaining prospective jurors. However, notwithstanding this plan, improper conduct, as mentioned, was occurring. Upon being informed by the bailiff of this conduct, Judge McKenzie then modified his initial plan by having the excused jurors sequestered in the grand jury room until individual voir dire was concluded. During this process, the trial judge denied a defense motion to quash to the jury venire.

¶39. The State cites *Myers v. State*, 565 So.2d 554, 558 (Miss. 1990), and argues that the conduct of the jurors in the case sub judice fall far short of the improper conduct of the *Myers* juror who lied or withheld information during voir dire:

> Following a jury's verdict, where a party shows that a juror withheld substantial information or misrepresented material facts, and where a full and complete response would have provided a valid basis for challenge for cause, the trial court must grant a new trial, and, failing that, we must reverse on appeal. We presume prejudice. Where, as a matter of common experience, a full and correct response would have provided the basis for a peremptory challenge, not rising to the dignity of a challenge for cause, our courts have greater discretion, although a discretion that should always be exercised against the backdrop of our duty to secure to each party trial before a fair and impartial jury.

¶40. *Myers* is indeed distinguishable from the case sub judice. In *Myers*, it was revealed that a juror, when asked if she had any relatives who had ever been involved in a criminal case, failed to answer that her husband had federal liquor-related convictions. The juror was called into chambers and interrogated, at which point she revealed that her husband was on federal probation as a result of a liquor violation and that her husband also had liquor violations in Scott County. She told the judge in chambers that she could be a fair and

22

impartial juror, but, as *Myers* was a case involving the illegal sale of alcoholic beverages, the trial judge dismissed the juror and replaced her with an alternate. We upheld the trial judge's decision to dismiss that juror.

¶41.   The case sub judice is distinguishable from *Myers* because in today's case, the record is devoid of identification of any particular trial juror who lied under oath or withheld information.[11] There was simply no identified juror who resembled the silent juror in *Myers*.

¶42.   Moody cites *Pulliam v. State*, 515 So.2d 945, 948 (Miss. 1987) for the proposition that a venire may be quashed where there is a showing of fraud, prejudice, or such a flagrant violation of duty as to amount to fraud. Again, the record here is simply devoid of any indication of fraud on the part of a juror. No doubt, the behavior about which Moody complains should not be condoned by the court, and the record is clear that Judge McKenzie did not condone such conduct on the part of certain members of the jury venire. Indeed Judge McKenzie did take curative action once this irregularity was brought to his attention inasmuch as he immediately put into place a plan to hold the excused jurors in the grand jury room until individual voir dire was concluded. Upon consideration of the applicable case law, such as *Porter*, and upon review of the record on this issue, there is no revelation of juror conduct rising to a level of fraud or prejudice. This issue is without merit.

### V.   WHETHER THE DEFENDANT WAS PREJUDICED BY REMARKS MADE BY THE BAILIFF.

---

[11]It is clear from the record that prior to the commencement of voir dire, the members of the jury venire were placed under oath to answer truthfully the questions propounded to them.

¶43. Moody argues that a bailiff's remarks within the hearing of a prospective juror during the voir dire process prejudiced him. The juror, Anita Bland, was eventually selected as a member of the trial jury in this case. Upon being informed of a possible impropriety, the trial judge took immediate action by individually interrogating Bland outside the presence of the remaining members of the jury venire, but in the presence of Moody and the attorneys. Basically, Bland testified that she heard a bailiff ask someone if he had a door "covered," meaning, had a door been secured. Bland testified on more than one occasion, "I knew you would have to have security" because this trial was a capital case. The record reveals that the following exchange occurred:

> MR. PRICE:
>
> Q: Ms. Bland, the judge asked you about an inference and I am unclear exactly – did you think that the gentleman was asking that anybody was covering the door for general security purposes or just what?
>
> A: Under the circumstances, really, I would think a capital murder case, you would have to have security.
>
> Q: Did you infer from that that Mr. Moody was dangerous or anything of that nature?
>
> A: I assumed that in case if something happened, he tried to get out of the room, that is what I assumed from that.
>
> Q: Did you assume that Mr. Moody is incarcerated?
>
> A: Yes.
>
> Q: Is there any particular reason? Is it based on that comment?
>
> A: Yes, sir – no. I would have assumed that anyway.
>
> Q: You would assume that someone charged with capital murder would be incarcerated?
>
> A: Yes.

Q: With that assumption, is that something that you would hold against Mr. Moody in hearing this case?

A: (Nods negatively).

Q: Do you understand that he is presumed innocent? The state has the burden to prove him guilty beyond a reasonable doubt?

A: Yes, sir.

Q: Would you disregard that conversation that you overheard in deliberating were you seated as a juror?

A: Yes, sir.

MR. KIRKSEY:[12] I have no questions of this witness.

¶44. When we consider the totality of Anita Bland's sworn answers to the questions propounded to her, it is abundantly clear that Bland well expected extra security in the case, not because of any suspected dangerous propensities on the part of Moody, but because of the general nature of the case -- a capital murder case. She assumed Moody was incarcerated, not because he was a flight risk, but because he was charged with capital murder – a crime punishable by death. In the end, Bland was definite in her responses to questions that she would not be influenced by the remarks of the bailiff/guard, that she could disregard any negative inferences which could be drawn for what had occurred, that she understood that Moody was presumed innocent and that the State had the burden of proving his guilt beyond a reasonable doubt, and that she could be a fair and impartial juror by deciding the case based on the evidence presented in open court and the law as given by the court.

---

[12]Kirksey is one of Moody's attorneys.

25

¶45.    Moody cites *Rush v. State*, 301 So.2d 297 (Miss. 1974), as a means by which to argue there was "overzealous security" in Moody's trial.   In *Rush*, the defendant argued that because the jury briefly saw him in handcuffs he was entitled to a new trial.   We did not agree.  Not only did we not find the handcuffs prejudicial in *Rush*, but handcuffs are not even at issue in the case sub judice.  The only possible similarity between *Rush* and the case today is that there could possibly be an inference of a dangerous defendant when one is shackled (as Rush was) and when extra security is provided (as with Moody).  However, as the State points out, Judge McKenzie not only ordered that Moody not be brought into the courtroom in the presence of the jury venire while shackled, he also ordered that the number of uniformed law enforcement officials be limited.

¶46.    This issue is without merit.

### VI.    WHETHER THE TRIAL JUDGE PROPERLY ALLOWED THE CONFESSION INTO EVIDENCE.

¶47.    Moody argues the trial judge committed reversible error by admitting into evidence his May 18, 1995, confession.[13]  His argument is based on a claim that the confession was coerced by law enforcement in order that his cousin Richard would not be arrested for the murders.  Moody was interviewed by two MHP/CIB officials, Lieutenant Sammy Pickens and Master Sergeant Kevin Fortinberry.  Also present at this interview were Perry County

---

[13]Judge McKenzie did enter an order suppressing Moody's statement of July 6, 1995, inasmuch as that statement had been given as partial consideration for the execution of the Memorandum of Understanding, which provided, inter alia, that "the statement could only be used for the purpose of a guilty plea or if [Moody] were charged with perjury.

Sheriff Carlos Herring and Deputy Sheriff Jimmy Dale Smith. Prior to beginning the interview, Lt. Pickens fully advised Moody of his *Miranda* rights.[14] Even though there was a written rights form and waiver before Moody, and even though Moody stated he could "read and write good," Lt. Pickens did not rely on Moody to simply read over the form and state that he understood his rights. Instead, Lt. Pickens read the rights to Moody, stopping each time to ask Moody if he understand that particular right. Referring to the rights form, Lt. Pickens verbally informed Moody that he had the right to remain silent; that anything he said could be used against him in a court of law; that he had the right to a lawyer before being asked any questions; that if he could not afford a lawyer, one would be appointed for him before questioning; and, that if he decided to answer questions without a lawyer present, he still had the right to stop answering questions at any time.[15] Upon explaining these rights to Moody, Lt. Pickens then explained to Moody the "waiver of rights."[16] At this point, Moody read the form and then signed the form at 2152 hours (9:52 p.m.) on May 18, 1995, along with Lt. Pickens and M/Sgt. Fortinberry. The following are pertinent excerpts of this interview:

---

[14]*See **Miranda v. Arizona***, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed. 2d 694 (1966).

[15]Moody obviously understood these rights because after giving certain incriminating statements, he stated "You said I could stop at any time. I'm ready to stop."

[16]It was the standard waiver of rights form: "I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

MOODY: I'll talk man, but ah y'all got my cousin up there an he ain't in this. Y'all need to let him go and then I'll talk. He ain't did nothin.[17]

HERRING: Who is that?

MOODY: Richie. He ain't got nothin to do with none of it.

FORTINBERRY: Well, you need to tell us about it and then we...If he ain't got nothin to do with it, we'll we'll cut him loose, if he wasn't involved Sunday night with these two.

MOODY: Somethin I don't want to talk about really. I was drunk. I mean, I'm gone tell y'all, this is hard for me.

FORTINBERRY: Yeah.

MOODY: I just wish somebody would kill me and get it over with. I killed both of em. I...I admit that. Turn that tape recorder now, I guess.[18]

Moody also said later in the confession:

The only reason why I need to talk to you is cause my cousin's over there and he didn't do nothin. Just cause he was hangin out with me, he didn't do nothin now. That's the only reason why I'm sayin anything to anybody is cause I feel guilty (inaudible) and he's settin over there and didn't do nothin. (inaudible) guilty the rest of my life and (inaudible).

¶48. Moody correctly argues that a confession must have been given voluntarily and not as the proximate result of any promises, threats, or other inducements. *Layne v. State*, 542 So.2d 237, 240 (Miss. 1989). He also cites *Abram v. State*, 606 So.2d 1015, 1032 (Miss. 1992), for the proposition that a confession made after the accused has been offered some

---

[17]Admittedly, immediately prior to making this statement, Moody had denied any involvement in the killings and then M/Sgt. Fortinberry informed Moody that he, Lt. Pickens, Sheriff Herring and Deputy Sheriff Smith knew "a whole lot" about what had happened. At this point, Moody mentions about wanting Richard released from jail "before talking."

[18]Moody then proceeded to give a detail account of the events surrounding the murders.

28

hope of reward if he will confess or tell the truth cannot be deemed to be voluntary. Moody further cites **Barnes v. State**, 199 Miss. 86, 23 So.2d 405 (1945) for the proposition that a confession can not be voluntary if it is given so that a third party may benefit from a defendant giving the confession.[19] In **Barnes**, there was a promise to release the defendant's son and daughter from jail if the defendant would confess. We held the confession inadmissible for the following reasons:

> It was made pursuant to statements and promises made to the accused by a detective and the sheriff to the effect that if he would confess the alleged crime his daughter, the said Mrs. Myrtis Burns, and his son Mack Barnes would be released from the Hinds County jail, which was accordingly done forthwith; that it would be better for him and the law would be lighter on him if he would confess; that the sheriff would take him from this jail, carry him home, and sign his bond if the court should allow a bond; and that the sheriff would do what he could for him – a hoped for aid which is so substantial as not to be lightly rejected as of no consequence by one accused of a capital felony in a sheriff's home county.
>
> . . . .
>
> It has long been settled by an unbroken line of decisions in this and other states that a confession of crime made under the circumstances hereinbefore related is not free and voluntary.

199 Miss. at 94-95, 23 So.2d at 407 (citations omitted).

¶49. Moody's statements of the law are correct, but they are inapplicable to his case. The alleged law enforcement conduct of which Moody now complains falls far short of the egregious conduct of the law enforcement officials in **Barnes**. Nowhere in the confession interview do the officers threaten or promise Moody anything. There is nothing in the record

[19]While no doubt applicable here, it is noted that this is obviously a pre-**Miranda** case.

which contains the slightest inference that Richard, Moody's cousin, was being held to induce a confession. Additionally, no one connected with law enforcement promised Moody that Richard would be released from jail in return for Moody's confession. We must consider Moody's confession in its totality. Moody initially denied any involvement in the murders of Bond and Hatcher; however, once M/Sgt. Fortinberry informed Moody that law enforcement already knew a lot about the killings, Moody then instigated the conversation about Richard. Moody told the law enforcement officials that Richard had nothing to do with the crimes and that "[y]'all need to let him go and then I'll talk." M/Sgt. Fortinberry then responded by stating that "[w]ell, you need to tell us about it and then....[i]f he ain't got nothin to do with it, we'll...cut him loose, if he wasn't involved Sunday night with...these two." Obviously, law enforcement was still involved in the early stages of an investigation of a double homicide. As indicated by M/Sgt. Fortinberry, responsible law enforcement officials were not going to arbitrarily "cut loose" any one until they knew whether that person had any criminal culpability for these heinous crimes. To act otherwise would be totally irresponsible. The only thing M/Sgt. Fortinberry told Moody was that Moody needed to tell them what happened and "if" Richard didn't have any involvement in the crimes, they would free him. That is what the citizens would expect from responsible law enforcement officials. Once a person is detained as a suspect in a crime, then the case should be properly investigated and if it is determined that the suspect was criminally involved, prosecute that person, and if it is determined that the suspect was not criminally involved, free that person. In other words, once the investigation was completed, if it were determined that Richard had

30

no involvement in the crimes, he would be released regardless of whether Moody gave a confession.[20]

¶50.   In *Abram v. State*, 606 So.2d 1015, 1029-30 (Miss. 1992) (which cited *Agee v. State,* 185 So.2d 671, 673 (Miss. 1966)), we discussed the criteria for determining the voluntariness of a confession:

> The State has the burden of proving the voluntariness of a confession. This burden is met by the testimony of an officer, or other person having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward. This makes out a prima facie case for the State on the question of voluntariness. *Lee v. State,* 236 Miss. 716, 112 So.2d 254 (1959). When objection is made to the introduction of the confession, the accused is entitled to a preliminary hearing on the question of the admissibility of the confession. This hearing is conducted in the absence of the jury. *Lee v. State,* supra, is also authority for the proposition that when, after the State has made out a prima facie case as to the voluntariness of the confession, the accused offers testimony that violence, threats of violence, or offers of reward induced the confession, then the State must offer all the officers who were present when the accused was questioned and when the confession was signed, or give an adequate reason for the absence of any such witness. *See also Holmes v. State,* 211 Miss. 436, 51 So.2d 755 (1951).

¶51.   The trial court conducted an evidentiary hearing after the State made out a prima facie case as to the voluntariness of the confession.  Sheriff Herring testified that he and Deputy Sheriff Smith were present for the confession, as well as M/Sgt. Fortinberry and Lt. Pickens

---

[20]As the prosecutor argued to the trial court at the conclusion of the suppression hearing, M/Sgt. Fortinberry was telling Moody "if his cousin had nothing to do with it, then he is not going to be in trouble. That is not an inducement for Mr. Moody to talk.  That's just making a statement that we're not going to charge somebody with anything if they had nothing to do with it."

with the MHP/CIB. He said Lt. Pickens read Moody his rights. Sheriff Herring testified that Moody did not appear to be under the influence of alcohol or drugs. He never heard any promises or inducements made to Moody. Deputy Sheriff Smith testified Moody was advised of his rights. Deputy Smith also testified Moody was promised nothing. Lt. Pickens testified that the statements about which Moody complains were made, but not as an inducement for Moody to confess. M/Sgt. Fortinberry corroborated the testimony of the other law enforcement officials as to the events regarding the confession.[21]

¶52.   At the conclusion of the suppression hearing, Judge McKenzie stated into the record a detailed ruling, in which he found, inter alia, from the record before him and based upon the totality of the circumstances, that the State had met its burden of proving the voluntariness of the statement beyond a reasonable doubt.

¶53.   In *Taylor v. State*, 789 So.2d 787 (Miss. 2001), we stated:

> The Mississippi Court of Appeals recently addressed the issue of overruling a motion to suppress in *Mullins v. State*, 757 So.2d 1027 (Miss. Ct. App. 2000). The Court of Appeals stated:
>
>> Regarding the overruling of a motion to suppress by the circuit court, our scope of review is limited. "Once the trial judge has determined at a preliminary hearing, that a confession is admissible, the defendant/appellant has a heavy burden in attempting to reverse that decision on appeal." *Sills v. State*, 634 So.2d 124, 126 (Miss. 1994) (quoting *Frost v. State*, 483 So.2d 1345, 1350 (Miss. 1986)). "Such findings are treated as findings of fact made by a trial judge sitting without a jury as in any other context. As long as the trial judge applied the correct

_____

[21]The *Agee* mandate was followed in that all law enforcement officials present at the time of Moody's confession were called to testify at the suppression hearing.

32

> legal standards, his decision will not be reversed on appeal unless it is manifestly in error, or is contrary to the overwhelming weight of the evidence." *Foster v. State*, 639 So.2d 1263, 1281 (Miss. 1994) (citations omitted). "Where, on conflicting evidence, the court makes such findings, this Court generally must affirm." *Lesley v. State*, 606 So.2d 1084, 1091 (Miss. 1992) (citations omitted).
>
> *Mullins,* 757 So.2d at 1030.

*Taylor*, 789 So.2d at 795.

¶54.   Clearly, Judge McKenzie made findings of fact which were supported by the record, and he applied the correct legal standards in determining that the State had proven the voluntariness of Moody's confession beyond a reasonable doubt based on the totality of the circumstances. Judge McKenzie's decision was not manifestly in error or contrary to the overwhelming weight of the evidence. Accordingly, this assignment of error is without merit.

### VII.   WHETHER THE TRIAL JUDGE COMMITTED REVERSIBLE ERROR BY ALLOWING THE STATE TO REHABILITATE THE TESTIMONY OF SAM PICKENS.

¶55.   Moody claims he was denied one of his major defense arguments by the trial judge permitting the State to rehabilitate the testimony of Lt. Sam Pickens, the MHP/CIB investigator. During cross-examination, Lt. Pickens testified initially that he believed three people were taken into custody for the crime.

> MR. KIRKSEY:
>
> Q: How many people, to your knowledge were arrested on May 18, 1995?
>
> A: Two, I believe, or three.

Q: All right.

A: I believe three were taken into custody.

MR. PRICE: Judge, could we narrow that down to where in the world?

MR. KIRKSEY: I think this witness knows exactly –

MR. PRICE: Well, I don't.

THE COURT: All right.

MR. KIRKSEY: Two or three. Thank you. Nothing further.

THE COURT: Any redirect?

MR. PRICE: Yes, sir.

Q: Do you know how many people were arrested for the crime on that day?

A: Yes, sir. Two.

.........................

Q: Are you aware of any evidence that indicates any involvement by Richard Moody? In your own mind as a criminal investigator, is there a piece of evidence in this case that links Richard Moody to the crime that occurred on that bridge and at that trailer?

A: Yes, sir.

Q: What is that?

MR. KIRKSEY: Your Honor, you can't impeach your own witness. He just answered the question.

THE COURT: Well, he said yes, sir. I guess he'll allow him to answer it. Didn't you ask him a follow-up question, Mr. Price?

MR. PRICE: Yes, sir.

THE COURT: You may answer.

A: Yes sir. As to what linked it?

Q: Is he a suspect in this crime?

A: Yes, sir.

Q: He was at the time, you're telling me?

A: Yes, sir.

Q: Okay. Today is he a suspect in this case in your mind?

34

A: Yes, sir.

Q: Because of what? I think we are miscommunicating.

¶56. At this point, the trial court excused the jury in order to develop the record to assure that the witness, a law enforcement official, clearly understood what the prosecutor was asking of him so as to not inadvertently offer inadmissible and potentially prejudicial testimony. The following exchange occurred outside the presence of the jury:

> THE WITNESS: I confused him with the other one.
>
> THE COURT: Richard with David?[22]
>
> THE WITNESS: Yes, sir.
>
> THE COURT: That's what I thought, but I don't know how we're going to clear that up in front of the jury. But he was afraid he was going to do wrong, and he didn't want to violate the admonition of the court.
>
> MR. PRICE: I understand, judge.
>
> THE COURT: He did absolutely right, so –
>
> THE WITNESS: Yeah, but he was taken into custody, but he was never charged, or nothing came of the investigation.
>
> Q: You don't believe as of today that he had anything –
>
> A: No, I don't, because I confused him with the other. That's what I was – no, there's nothing.
>
> THE COURT: So what are you going to say when the witness comes out, Mr. Price?
>
> MR. PRICE: I'm going to ask him was –
>
> THE COURT: Or when the jury comes out, not the witness. The witness is here.

---

[22]Again, David is Kenneth's cousin who was also convicted for his involvement in these crimes. See n. 6.

MR. PRICE: – was Richard Moody charged with this crime and does he believe Richard Moody had anything to do with this crime.

MR. KIRKSEY: Your Honor, to which I'd object. What this amounts to is coaching his own witness outside the presence of the jury, when the jury has already heard him say three times that Richard Moody was a suspect.

THE COURT: I would normally agree with you, but I can take the blame here because I'm the one – though it was highly unusual to do so, I'm the one that admonished these witnesses not to say anything about David Moody, and it's my understanding that this witness had that confusion with that, and that's why he was as reluctant as he was. Now, I don't know how to cure it in front of the jury.

MR. KIRKSEY: My point is, I'm sorry that the State's witness was confused between Richard and David Moody, but the truth of the matter is, that's what was asked, was Richard Moody a suspect then and is he a suspect today.

THE COURT: That's what was asked, you're correct.

MR. KIRKSEY: And that is a very direct question only requiring an answer, and if the witness for the state missed his mark, I would agree with Your Honor if David Moody's name had been mentioned, but it wasn't, and I object to any curative ability here to try to fix this. I mean, it's kind of like, is this a play, put an X on the floor and let us stand there? I don't think so.

MR. PRICE: Now, can I say something?

THE COURT: Sure.

MR. PRICE: Thank you. Judge, I asked for the opportunity to ask this witness one question in front of this jury to clear it up, and that would have cleared it up and did clear it up. I said, was Richard Moody charged in this case? And that's when he realized that it was not Richard who was charged in this case, but David, and it's unfair to us to send the jury out during the miscommunication.

¶57.   The matter was in due course resolved without the jury present. Once the testimony resumed in before the jury, the State was allowed to rehabilitate the witness as follows:

> Q: Deputy Pickens, before the break we were talking about Richard Moody.
>
> A: Yes, sir.
>
> Q: Were you confused about who Richard Moody is?
>
> A: Yes, sir.
>
> Q: Okay.  Now, I"m going to go back and ask you, was he arrested the same day as Kenneth?
>
> A: Yes, sir, he was taken into custody.
>
> Q: Okay, now, did he have anything to do with this crime that we're here trying today?
>
> MR. KIRKSEY: To which I'm going to object, Your Honor, for all the reasons I stated outside the presence of the jury.
>
> THE COURT: All right.  I'm going to overrule, and though procedurally it is highly irregular, if you want to ask some questions based on that, I'll allow you to do so, even though it's highly unusual procedure-wise.

¶58.   At this point, Moody's counsel moved for a mistrial and had a rather heated exchange with the trial judge, with counsel implying that the judge was disregarding the law and doing whatever he wanted. Fortunately, the trial judge again put the jury in recess before matters got out of hand, and admonished counsel for his conduct.

¶59.   Likewise, in his brief, counsel argues that the trial judge was offering "aggressive assistance" to the State and a mistrial should have resulted.  He cites *West v. State*, 519 So.2d 418 (Miss. 1988), for the proposition that the trial judge can not try the case for the prosecution.

¶60. In *West*, we reversed a murder conviction because the trial judge was actively involved in the prosecution of the case. The trial judge interjected his own questions into cross-examination, and warned the prosecutor his questions were going to cause the case to be reversed on appeal. We found thirty instances in *West* where the trial judge improperly, or unnecessarily, interjected himself into the proceedings. Of those thirty instances, twenty appeared to be the trial judge coaching the district attorney. On nine occasions, the trial judge posed questions to witnesses where the district attorney's questions were ineffective. We found the questions by the trial judge generally served to strengthen the prosecution's case.

¶61. In the case sub judice, the trial judge's behavior in no way resembles that in *West*. In the cross-examination of Lt. Pickens, and throughout the entire trial, the trial judge exercised the utmost caution and in no way appeared to be trying the prosecution's case, as was the case in *West*. In fact, the trial judge had a duty to assure that his prior admonishment was followed by the witnesses.[23] The record reveals that when it appeared to Judge McKenzie that Lt. Pickens was getting confused as to Richard Moody and David Moody and was about to unintentionally violate the trial court's prior admonishment, Judge McKenzie, sua sponte, dismissed the jury; and, it is obvious that both defense counsel and the prosecutor objected to the procedure. When the trial court suggested that the jury ought to be put in recess to clear up the matter, the prosecutor replied "Judge, I can clear it up with him right here...May

---

[23]The trial judge had previously issued an admonishment that no witness should testify before the jury concerning any other matters involving Angela Freeman, David Moody, or Kenneth Moody.

I just ask him one question." Judge McKenzie did not permit the prosecutor's request, but instead put the jury in recess. While the jury was out and during an exchange between the court and counsel, the prosecutor again stated, "Judge, I asked for the opportunity to ask this witness one question in front of this jury and clear it up, and that would have cleared it up and did clear it up." It is abundantly clear from the record that the trial judge was not attempting to aid the prosecution, but instead was attempting to assure compliance with his prior admonishment, which was more beneficial to Moody than to the State, and now he's being criticized by Moody. This Court can understand that since Moody was presenting a theory that Richard possibly committed these crimes and a State's witness had obviously gotten confused in the proper identification of one of the Moodys,[24] counsel for Moody would want the State's witness to remain confused since he was suddenly implicating Richard as being involved in the murders of Bond and Hatcher. With the dynamics of a trial, and based on our rules of procedure and rules of evidence, the trial judge would never want to knowingly declare a recess in a civil or criminal trial at a point in the trial where counsel would have the opportunity to clandestinely "coach" a witness concerning testimony. But again, the record reveals that the trial judge's declaration of a recess during Lt. Pickens's testimony was met with disfavor by not only defense counsel, but also the prosecutor. In fact the prosecutor stated that it was "unfair" for the judge to have sent the jury out "during the miscommunication." The trial judge was not trying to aid the State. He was trying to protect

---

[24]While the jury was out, the prosecutor stated "Judge, the jury has already heard there are 20-something Moodys out there."

Moody's rights by assuring compliance with the court's prior admonishment. Also, when the testimony of Lt. Pickens resumed before the jury, the trial judge offered defense counsel surrebuttal, which is discretionary with the trial judge, who controls the manner and mode of examination of witnesses. This invitation for surrebuttal was declined by defense counsel.

¶62.    The State cites *Jasper v. State*, 759 So.2d 1136, 1139 (Miss. 1999), which is more analogous to the case sub judice.   The judge indicated that he wanted a witness in *Jasper* to take more time to answer a question.   From *Jasper*:

> Q. Okay. Let me see if I can refresh your memory. You don't remember anything about it now?
> A. What did I hit, or what hit me?
> Q. Okay. You don't remember?
> A. No.
> Q. That was in '76, about twelve years ago. Okay. Do you recall--
> BY THE COURT: (Interposing)
> Just a minute. I want him to take some time and answer that. I find it, quite frankly, incredible that you wouldn't remember that you had an accident. Let him have some time. I want him to answer that, one way or the other.

Like the case sub judice, this interjection of the trial judge took place outside the presence of the jury. *Id.* at 1139. While we looked with disfavor on the actions of the trial judge in *Jasper*, we found that the judge's actions did not constitute reversible error inasmuch as they occurred outside the presence of the jury.

¶63. The State also relies on *Williams v. State*, 539 So.2d 1049 (Miss. 1989), where we found the prosecution did, in effect, "coach" the witness with a hand gesture. The trial judge did not grant a mistrial as to the issue, but we reversed and remanded for new trial. In *Williams*, the District Attorney encouraged an answer by a State's witness to a particular question posed by defense counsel during cross-examination, by use of a hand gesture, signaling that it was acceptable to answer the question the witness was asked. This was done in front of the jury, and we reversed on the issue, noting that "[a]n attorney should never signal to a witness, regardless of how innocent the action may be, because this leaves with the jury the impression of covertness and partiality between the witness and the signaling party." *Id.* at 1053.

¶64. Again turning to the record before this Court in the case sub judice, there is nothing which occurred outside the presence of the jury or in the presence of the jury which even remotely begins to rise to the level of the improper conduct causing reversal in the other cases discussed. This issue is without merit.

### VIII. WHETHER MOODY WAS PROPERLY INDICTED FOR THE CAPITAL MURDER OF WILLIAM HATCHER WITH THE SEXUAL BATTERY OF ROBBIE BOND AS THE UNDERLYING FELONY.

¶65. Moody argues that Count Two of the indictment against him is fundamentally flawed because the victim of the underlying felony of sexual battery (Bond) is distinct from the

41

second person who was murdered (Hatcher). Therefore, Moody argues, there should not be an attempt to link the death of Hatcher to the sexual battery of Bond.

¶66. Count Two of the indictment states that on May 14, 1995, in Perry County, Mississippi, Kenneth Moody:

> Did unlawfully, wilfully and feloniously, with malice aforethought, kill and murder a human being, to wit: WILLIAM HATCHER, while engaged in the commission of the crime of Sexual Battery on the person of ROBBIE BOND, to wit: did then and there unlawfully, wilfully, and feloniously engage in sexual penetration with her and without her consent, the said ROBBIE BOND, in violation of Section 97-3-95 (1)(a) of the Mississippi Code of 1972, as amended, all in violation of Section 97-3-19(2)(e) of the Mississippi Code of 1972, as amended, against the peace and dignity of the State of Mississippi.

¶67. Miss. Code Ann. §97-3-19(2)(e) states, in pertinent part:
> (2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
>> (e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, robbery, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or in any attempt to commit such felonies.

¶68. Moody argues that the language "in the commission of" renders the indictment flawed because Hatcher was not killed while "in the commission of" the sexual battery of Bond. We disagree. Certainly, Moody could not have carried out the sexual battery of Bond had

42

he not first murdered Hatcher so that he would then be unimpeded in committing these acts

upon Bond. The language of the statute is not ambiguous: "...*any person engaged in the*

*commission of* the crime of...sexual battery, or in *any attempt to commit* such felonies."

(emphasis added).

¶69.    In *West v. State*, 553 So.2d 8, 13 (Miss. 1989), the defendant was convicted of capital

murder, with the underlying felony, as here, being sexual battery. In *West*, we stated:

> An indictment charging a killing occurring 'while engaged in the
> commission of' one of the enumerated felonies includes the
> actions of the defendant leading up to the felony, the attempted
> felony, and flight from the scene of the felony. *E.g., Neal v.
> State*, 451 So.2d 743, 757-58 (Miss. 1984); *Pruett v. State*, 431
> So.2d 1101, 1104-05 (Miss. 1983). The fact that the actual
> moment of the victim's death preceded consummation of the
> underlying felony does not vitiate the capital charge.

553 So.2d at 13. We also held in *West*:

> Mississippi law accepts a 'one continuous transaction' rationale
> in capital cases. In *Pickle v. State,* 345 So.2d 623 (Miss. 1977),
> we construed our capital murder statute and held that 'the
> underlying crime begins where an indictable attempt is
> reached....' 345 So.2d at 626; *see also Layne v. State,* 542 So.2d
> 237, 243 (Miss. 1989); *Fisher v. State,* 481 So.2d 203, 212
> (Miss. 1985); and *Culberson v. State,* 379 So.2d 499, 503-04
> (Miss. 1979).

553 So.2d at 13.

¶70.    Moody cites *Pickle*, as well, in an attempt to argue that when he made the decision

to sexually batter Bond, that action did not cause the already completed murder of Hatcher

43

to rise to the level of capital murder.  We  see no way Moody could construe *Pickle* in his favor:

> The res gestae of the underlying crime begins where an indictable attempt is reached and ends where the chain of events between the attempted crime or completed felony is broken. Application of the felony-murder doctrine does not require that the underlying crime shall have been technically completed at the time of the homicide, nor does it matter at what point during the commission of the underlying felony the homicide occurs. *When, however, **there is a break in the chain of events** leading from the initial felony, as by the felon's abandonment of the original criminal activity, a subsequent homicide committed by him is not within the felony-murder statute, and it is a question of fact for the jury whether the original criminal activity did in fact terminate prior to the homicide.* In this connection, escape or attempted escape is generally held to be so immediately connected with the initial crime as to be a part of it.

*Pickle v. State*, 345 So.2d 623, 626 (Miss. 1977) (quoting from 40 Am.Jur.2d *Homicide* § 73, at 366-367 (1968) (emphasis added).

¶71.    In this case, there is never a break in the chain of events.  The record reveals that Moody first killed Hatcher, then immediately thereafter sexually assaulted and killed Bond. Moody's actions fall within the purview of the capital statute.

¶72.    This issue is without merit.

> **IX.    WHETHER THE STATE'S EVIDENCE WAS LEGALLY SUFFICIENT TO PROVE THE CAPITAL MURDER OF WILLIAM HATCHER IN COUNT TWO OF THE INDICTMENT.**

¶73.    Moody argues that the State did not prove Hatcher was murdered while in commission of a sexual battery on Bond.  The State counters by citing ***Benson v. State***, 551 So.2d 188

44

(Miss. 1989), wherein this Court illustrated the well-established standard as to legal sufficiency of the evidence:

> When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidence - not just that supporting the prosecution - in the light most consistent with the verdict. We give the prosecution the benefit of all favorable inferences that may be reasonably drawn from the evidence. If the facts and the inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that the was guilty, reversal and discharge are required. On the other hand, if there is in the record such substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fairminded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb. *See e.g.*, *Gavin v. State,* 473 So.2d 952, 956 (Miss. 1985); *May v. State,* 460 So.2d 778, 781 (Miss. 1984).

*Benson v. State,* 551 So.2d 188, 192-93 (Miss. 1989) (citing *McFee v. State*, 511 So.2d130, 133-34 (Miss. 1987).

¶74.    Moody argues that Hatcher was already dead when the sexual battery was committed upon Bond; therefore, according to Moody, Hatcher's murder could not have been capital murder because Moody's intent to sexually batter Bond was not formed at the time he murdered Hatcher.   Moody points to the testimony of Dr. Steven Hayne, who testified that based on the blows received by Hatcher, he would expect that Hatcher was rendered immediately unconscious with death occurring in "a non prolonged period of time" after that.

45

¶75.   As the State points out, intent to sexually batter Bond could be inferred from the actions of Moody, who had to first incapacitate Hatcher in order to get to Bond.  This is a reasonable inference which may reasonably be drawn from the evidence.  The jury by its verdict obviously found that this was Moody's purpose.

¶76.   Moody would have us believe that the intent to sexually batter Bond was not formed until after the death of Hatcher - that there was a break in the chain of events whereby Hatcher had been dead before it ever entered Moody's mind to sexually batter Bond.  As the State argued in its brief, the "crimes against Hatcher and Bond were so intertwined that they constituted a continuous act."  There was certainly more than sufficient evidence in the case sub judice for the jury to find that Moody possessed the requisite intent to sexually batter Bond before the murder of Hatcher and, according, the guilty verdict is beyond our ability or authority to disturb.

¶77.   Moody cites *Walker v. State*, 671 So.2d 581 (Miss. 1995), which involved proof of a definite intent by the defendant to sexually batter the murder victim, as evidenced by a statement made by the defendant that he had "always wanted to do that." *Id*. at 595.  Moody argues that there is only circumstantial evidence in the case sub judice to demonstrate Moody's intent, and, being such, it falls outside the dictates of *Walker*.  We disagree and also cite from *Walker*:

       This Court said in *Shanklin v. State*, 290 So.2d 625 (Miss. 1974):

46

Intent to do an act or commit a crime is also a question of fact to be gleaned by the jury from the facts shown in each case. The *intent to commit a crime or to do an act by a free agent can be determined only by the act itself, surrounding circumstances, and expressions made by the actor with reference to his intent.*

*Id.* at 627 (emphasis added).

The Court further stated in ***Thompson v. State***, 258 So.2d 448 (Miss. 1972):

Unless one expresses his intent, the only method by which intent may be proven is by showing the acts of the person involved at the time in question, and by showing the circumstances surrounding the incident.

671 So.2d at 595.

¶78.    While Moody may not have expressed his intent, there is no doubt that his intent to sexually assault and batter Robbie Bond was proven by his actions and the surrounding circumstances.

¶79.    This issue is without merit.

### X.    WHETHER THE TESTIMONY OF JODY NEWELL AND THE ADMISSION OF VAGINAL SWABS AND SLIDES WERE PROPERLY ALLOWED.

¶80.    Moody argues that Jody Newell's testimony as to the vaginal swabs and slides pertaining to Robbie Bond should not have been allowed by the trial court because Newell did not take the samples herself and she had no specific recollection of the samples taken in the case sub judice.  Newell testified on direct examination that she was present when Dr. Ward conducted the autopsy of Robbie Bond and observed Dr. Ward take the vaginal swabs. She testified as to the general procedure followed by Dr. Ward and her in collecting and

47

preserving vaginal swabs as evidence, and that this procedure was followed with Bond. On cross-examination, Newell admitted that she did not recall this particular autopsy, but that the same procedure was followed in every case.

¶81.    M.R.E. 602 states:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself. This rule is subject to the provisions of rule 703, relating to opinion testimony by expert witnesses.

¶82.    The State correctly cites ***Parker v. State***, 606 So.2d 1132, 1136 (Miss. 1992), where we held:

> 'The relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused.' *Johnston v. State,* 567 So.2d 237, 238 (Miss. 1990), citing *Hentz v. State,* 542 So.2d 914, 917 (Miss. 1989), *Monk v. State,* 532 So.2d 592, 599 (Miss. 1988). Unless the trial judge's discretion is so abused as to be prejudicial to the accused, this Court will not reverse his ruling. *Shearer v. State,* 423 So.2d 824, 826 (Miss. 1983), citing *Page v. State,* 295 So.2d 279 (Miss. 1974). The discretion of the trial judge must be exercised within the boundaries of the Mississippi Rules of Evidence. *Johnston,* 567 So.2d at 238.

The trial judge did not abuse his discretion in allowing the testimony of Newell, as she had the requisite personal knowledge of that about which she was testifying. Once the evidence was received, it was for the jury to determine what weight and credit to give the evidence based on Newell's admission that she did not recall this particular autopsy.

¶83.   This issue is without merit.

## XI.   WHETHER THE DNA IDENTIFICATION TESTIMONY OF GINA PINEDA WAS PROPERLY ADMITTED.

¶84.   Moody argues that Gina Pineda's testimony should not have been allowed because Reliagene, the DNA testing facility where she was employed, had no reliable scientific test for low level contaminated and degraded samples. Moody also argues that it is not known whether Reliagene's testing for such samples are generally accepted in the scientific community.

¶85.   Pineda's testimony reveals otherwise. She testified extensively about the typing kit that was used for this case. She said the typing kit that was used would not give a wrong result. Pineda explained that even with degrading DNA, the test Reliagene used would not give a wrong result; it would just give no result at all. This test is in accordance with FBI standards. Pineda also testified that Reliagene was accredited by the DNA Advisory Board, and the Technical Working Group on DNA Analysis Methods. These organizations, she explained, consist of scientists, law enforcement agents, and lawyers and write guidelines for DNA testing facilities across the country.

¶86.   Moody attempted to argue that in order for Pineda's testimony to be admitted, it would need to be shown that they had done in-house validation studies of their procedures. On cross-examination, during a suppression hearing outside the presence of the jury, Moody's counsel asked:

Q: Now, I've got one simple question for you. Has Reliagene ever done an in-house laboratory validation study on a degraded sample?

A: Yes, we have.

Q: Do you have that here today?

A: I have that in the form of the published paper that I said we participated in.

Q: I heard all that.

A: Reliagene did part of that study, and that study included degradation studies.

Q: I heard all that, Ms. Pineda

A: Okay

Q: I heard you testify about a paper that you participated in with 26 other companies.

A: That's correct.

Q: My question is simpler than that. Has Reliagene ever performed its own validation study in-house, in New Orleans, to verify y'all's work on a degraded sample. That's a yes or no answer.

A: Yes.

Q: In house?

A: Yes.

¶87. Counsel for Moody argued that it was "clear" from Pineda's testimony that Reliagene "does not have accredited protocols for testing of mixed, degraded low level samples" of DNA; however, outside the presence of the jury, the attorneys and the trial judge had the following exchange:

MR. PRICE: Judge, I would just say on behalf of the state, I think Ms. Pineda's testimony establishes clearly that a validation study was done and that she previously testified the lab is accredited and further testified today and clarified that this particular work in the area of mixed sample has been done.

50

THE COURT: That certainly appears to be the testimony, Mr. Kirksey.

¶88. The defense's own witness, Dr. Craig Cohen, a genetics expert, admitted that Reliagene had done an excellent job.

(MR. PRICE CROSS-EXAMINATION)

Q: Have you ever worked at an accredited forensic lab?

A: No, I haven't. It's a tremendous amount of work to do this, and I can tell you, ReliaGene does an excellent job.

Q: Okay, Except in this case, in this instance, is that what you're saying?

A: Actually in this case, with the exception of this sample, they did an exceptional job.

Q: Okay. So you reviewed–

A: And, actually, you know, I use ReliaGene as an example of how labs should function.

¶89. Dr. Cohen went on to testify that of the 30 or 40 samples Reliagene tested, he only had a problem with one of the samples.

¶90. When the trial judge admits evidence and testimony, reversal is not warranted absent a showing of prejudice to the accused, such that the trial judge can be said to have abused his discretion. *Ivy v. State*, 641 So.2d 15, 18 (Miss. 1994). There was no abuse of discretion by the trial judge in allowing Pineda's testimony. This issue is without merit.

**XII.    WHETHER THE TRIAL JUDGE PROPERLY DENIED THE MOTION FOR A CIRCUMSTANTIAL EVIDENCE**

## INSTRUCTION ON THE UNDERLYING FELONY OF SEXUAL BATTERY.

¶91. Moody argues that he should have been granted a circumstantial evidence instruction as to the underlying felony of sexual battery. He argues that the May 18, 1995, confession contains no admissions to sexual battery. He also argues there is no direct evidence at trial to support a charge of sexual battery. The admitted portion of the confession did not contain Moody's confession to sexual battery; however, we disagree with Moody's assertion that there was only circumstantial evidence concerning the sexual battery. While Moody correctly states that Dr. Hayne testified there was no evidence of vaginal trauma, we must look at the totality of Dr. Hayne's testimony. During cross-examination, Dr. Hayne stated studies revealed that in premenopausal women, it is not only possible, but in many instances probable, that a sexual assault may result in no injury to the genitalia. Dr. Hayne also testified during direct examination that the decomposition of Bond's body could have made such trauma difficult to interpret.

¶92. Moody argues that there was seminal fluid and not sperm on the vaginal slides and that therefore he was entitled to a circumstantial evidence instruction. However, Kelly Franovich, a forensic serologist, found intact sperm cells on a vaginal slide. Moody also confessed to the capital murders, which is in and of itself direct evidence. When considering the totality of the evidence offered by the State's witnesses, including the testimony of Dr. Hayne and Franovich, there was sufficient evidence to place the issue of sexual battery beyond the realm of one on which a circumstantial evidence instruction was

warranted. We have held that where there is any question regarding the weight of the evidence, the question is for a jury to resolve. *Eakes v. State*, 665 So.2d 852, 872 (Miss. 1995). In the end, this was clearly a direct evidence case and thus a circumstantial evidence instruction was not warranted. This issue is without merit.

## XIII. WHETHER THE TRIAL JUDGE PROPERLY DENIED THE INSTRUCTION ON THE LESSER INCLUDED OFFENSE OF MANSLAUGHTER ON COUNT TWO OF THE INDICTMENT.

¶93. Moody did not object to the denial of a manslaughter instruction at trial, rendering it procedurally barred. "Errors based on the granting of an instruction will not be considered on appeal unless specific objections stating the grounds are made in the trial court." *Collins v. State,* 368 So.2d 212 (Miss. 1979); *Oates v. State*, 421 So.2d 1025, 1030 (Miss. 1982).

¶94. However, Moody now argues that he deserved an instruction on heat of passion manslaughter, on count two of the indictment (Hatcher's murder) as provided by Miss. Code Ann. § 97-3-35:

> The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter.

¶95. He further argues that the May 18, 1995, confession was subject to the interpretation that Hatcher was killed in the heat of passion. The statement simply does not reveal that.

> FORTINBERRY: Well what...and then what brought it about for you to stab him and how how did that come about?

53

MOODY: Just....I left and I come back by. When I come back by, they was just standin there.

FORTINBERRY: You left and went across the bridge?

MOODY: Um hum.

FORTINBERRY: Which..which way was you goin?

MOODY: Towards their truck and I come back across.

FORTINBERRY: You went down there and turned around and come back across?

MOODY: Um hum.

FORTINBERRY: And that's when you stabbed him?

MOODY: Yes sir.

¶96.    In *Carter v. State*, 199 Miss. 871, 879, 25 So.2d 470, 473 (1946), we held, "The chief distinction between murder and manslaughter is the presence of deliberation and malice in murder and its absence in manslaughter."

¶97.    Moody cites *McGowan v. State*, 541 So.2d 1027 (Miss. 1989), but he omits certain language which we now quote.  In *McGowan,* we held:

> We have repeatedly held that the accused is entitled to have the jury instructed that it may consider convicting him of a lesser offense only where there is in the record an evidentiary basis therefor. *Lee v. State,* 469 So.2d 1225, 1230 (Miss. 1985); *Ruffin v. State,* 444 So.2d 839, 840 (Miss. 1984); *Colburn v. State,* 431 So.2d 1111, 1114 (Miss. 1983). Such instructions should not be granted indiscriminately, nor on the basis of pure speculation. *Mease v. State,* 539 So.2d 1324, 1329 (Miss. 1989). Our evidentiary standard has been laid out in *Harper v. State,* 478 So.2d 1017, 1021 (Miss. 1985):
>
>> A lesser-included offense instruction should be granted unless the trial judge and ultimately this Court can say, taking the evidence in the light most favorable to the accused and

54

considering all the reasonable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of a lesser-included offense (conversely, not guilty of at least one essential element of the principal charge).

*Harper,* 478 So.2d at 1021; *Fairchild v. State,* 459 So.2d 793, 800 (Miss. 1984); *Lee v. State,* 469 So.2d at 1230-31. *Harper* elaborates further:

Only if this Court can say, taking the evidence in the light most favorable to the accused and considering all reasonable favorable inferences that can be drawn in favor of the accused from the evidence, and considering the evidence that the jury may not be required to believe any evidence offered by the State, that no hypothetical reasonable jury could convict [the defendant] of simple murder could it be said that the refusal of a lesser-included offense instruction was proper.

*Harper,* 478 So.2d at 1021; *see most recently Mease v. State, supra*; *Rowland v. State,* 531 So.2d 627, 631 (Miss. 1988).

541 So.2d 1027, 1028-29.

¶98.   The granting of a manslaughter instruction in this case, based on the record, would have been purely speculative and not supported by the evidence.  We have held, regarding heat of passion, that the test is whether the defendant acted in the heat of passion and without malice.  In *Taylor v. State,* 452 So.2d 441, 449 (Miss. 1984), we held that the question is an objective one, being whether a reasonable person would have been so provoked.  There is nothing in the record which reveals that Moody's violent behavior in this case  was provoked.

¶99.   This issue is without merit.

## CONCLUSION

55

¶100. We have meticulously studied the record in this case and the applicable law in light of Moody's numerous assignments of error. In so doing, we find no reversible error. Therefore, Moody's convictions on two counts of capital murder and the trial court's imposition of consecutive life sentences are hereby affirmed.

¶101. **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT, WITHOUT PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT, WITHOUT PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCES SHALL RUN CONSECUTIVELY WITH EACH OTHER AND NOT CONCURRENTLY.**

**PITTMAN, C.J., SMITH, P.J., WALLER, COBB, DIAZ, EASLEY AND GRAVES, JJ., CONCUR. McRAE, P.J., NOT PARTICIPATING.**